

FILED
Jun 26, 2026
12:11 PM(CT)
TENNESSEE
WORKERS' COMPENSATION
APPEALS BOARD



# TENNESSEE BUREAU OF WORKERS' COMPENSATION
## WORKERS' COMPENSATION APPEALS BOARD

| | |
|---|---|
| Calvin Howell | Docket No. 2024-70-6705 |
| v. | State File No. 13558-2024 |
| 501K Recycling Center, LLC, et al. | |
| Appeal from the Court of Workers' Compensation Claims Amber E. Luttrell, Judge | Heard June 9, 2026 in Nashville |

---

### Affirmed and Remanded

---

In this interlocutory appeal, the employee reported sustaining various injuries at work when he was struck by a forklift and pinned against a heavy box. After providing certain authorized medical treatment for both low back and left leg symptoms, the employer declined to authorize further medical treatment for the back complaints after obtaining additional evidence it believed supported its denial of such benefits. Thereafter, the employee sought a medical evaluation on his own and filed a request for an expedited hearing. Following that hearing, the trial court determined the causation opinion offered by the employee's medical expert rebutted the presumption of correctness accorded the causation opinion of the authorized physician, and it ordered the employer to provide additional medical treatment. The employer has appealed. Having carefully reviewed the record, we affirm the trial court's order and remand the case.

Presiding Judge Timothy W. Conner delivered the opinion of the Appeals Board in which Judge Pele I. Godkin and Judge Meredith B. Weaver joined.

Richard R. Clark, Jr. and Karli M. Sarratt, Nashville, Tennessee, for the employer-appellant, 501K Recycling Center, LLC

Adam C. Brock-Dagnan, Knoxville, Tennessee, for the employee-appellee, Calvin Howell

### Factual and Procedural Background

Calvin Howell ("Employee") worked as a forklift operator and material handler for 501K Recycling, LLC ("Employer"). On February 14, 2024, Employee reported sustaining injuries while working inside a trailer when a forklift struck his lower left leg and pinned

him against a heavy box. He described a progression of pain, numbness, tingling, and swelling in his left foot and lower leg throughout the rest of his shift. He went to a local emergency room that evening, without authorization, then spoke with Employer the following day and was offered a panel of medical providers, from which he selected Fast Pace Health ("Fast Pace").

Employee first went to Fast Pace on February 16 with complaints of left ankle, knee, foot, and hip pain. According to the report of that visit, Employee also reported complaints of muscle pain, numbness/tingling, swelling, hip pain, and back pain, which the nurse practitioner who examined him described as "abnormal symptoms related to the complaint." She noted evidence of swelling in the left foot, tenderness in the left ankle, and an abrasion above the left ankle. After an x-ray of the left foot revealed "[n]o fracture or other acute finding," Employee was discharged with instructions to use over-the-counter pain medications and apply ice as needed. He was given work restrictions of no jumping, running, or climbing, and to avoid prolonged or excessive standing or bending at the waist "in effect until 2/20/24," and he was told to follow up with an orthopedic physician's assistant ("PA") at Fast Pace.

Employee was subsequently evaluated by William Higham, PA, on February 20. During that visit, he complained of left hip pain, left knee and foot pain, and stiffness in his left leg. During the physical examination, Mr. Higham noted tenderness in the left knee and mild swelling in the lower leg. He also found evidence of "mildly reduced [range of motion] of lower back" and abnormal sensation in the left foot. Mr. Higham diagnosed a left foot contusion, muscle strains in the left leg, a left knee sprain, and a lower back strain. He prescribed physical therapy and recommended use of a knee brace. He slightly modified Employee's work restrictions to no kneeling or squatting and to avoid prolonged standing or excessive bending or twisting at the waist, which were "in effect until 3/12/24."

On March 14, Employee returned to Fast Pace with ongoing complaints of left leg and low back pain. Mr. Higham noted tenderness in the left lumbar area of the spine. He prescribed medications and recommended use of an ankle brace. He also instructed Employee to continue physical therapy and extended his work restrictions until April 4.

The primary focus of the following appointment on April 4 was Employee's left hip pain. Mr. Higham's physical examination continued to show "tenderness of the left lateral pelvis and iliac crest." Range of motion testing in the hip produced pain, and Mr. Higham noted that an MRI of the pelvis was needed. He also noted that "[p]atient has failed 5 weeks of formal physical therapy."

The left hip MRI was completed on May 21 and showed "no evidence of acute tear of the abductor tendons at the left iliac crest of left hip." In his May 23 report, Mr. Higham referred Employee to an orthopedic surgeon for further evaluation "due to continued pain of the hip and lower back."

On May 28, Employee selected Dr. Blake Chandler from Employer's panel as his treating orthopedic physician. He first saw Dr. Chandler on June 26, 2024, at which time he reported left hip pain following a work-related injury. Dr. Chandler's report reflects that Employee told Dr. Chandler about his prior history of low back pain.[1] Dr. Chandler ordered x-rays of the left hip, which revealed "no significant abnormalities." He also noted that the May 2024 MRI of the left hip showed "no acute soft tissue or bony abnormalities." He ordered a lumbar MRI and released Employee to return to work full duty.[2]

The MRI of the lumbar spine was completed on July 11 and was interpreted to show "degenerative disc changes in the lower lumbar spine with neural foraminal narrowing." He also stated there was "contact of the exiting nerve root." Dr. Chandler reviewed the MRI results with Employee during an appointment on July 15. He explained to Employee that the degenerative changes preexisted the work accident but that the accident "could have caused the aggravation and symptoms to be known." He recommended epidural steroid injections and, if that did not improve Employee's symptoms, a referral to a neurosurgeon. In addition, Dr. Chandler assigned work restrictions of no lifting over ten pounds, no kneeling, crawling, climbing, stooping, bending, or prolonged walking or standing. This was the first lifting restriction placed on Employee since the work accident.

According to Employee's testimony during the expedited hearing, Employer declined to authorize any further medical treatment following his second visit with Dr. Chandler, and temporary disability benefits were terminated soon thereafter. Employee later learned that part of the basis for Employer's decision to deny payment of additional benefits was surveillance video showing Employee transferring bags of mulch from a cart to the trunk of his car, which occurred May 21, 2024, after Employee's final visit to Fast Pace. Employee testified that, as of the date of that surveillance, he was under no specific lifting restriction from any medical provider. He also testified that he never lifted the bags of mulch from the ground level, but merely "transferred them" one at a time from a stack to a cart then from the cart to the trunk of his car.[3]

In a letter to Dr. Chandler dated July 16, 2024, Employer's counsel asked Dr. Chandler about the surveillance report and its impact on the causation opinion he expressed in his July 2024 report indicating that the work accident aggravated Employee's preexisting

---

[1] During the expedited hearing, Employee testified that he brought a disc containing films of the 2019 lumbar MRI to his first appointment with Dr. Chandler. According to Employee, when he offered the disc to Dr. Chandler, the doctor declined to accept the disc. Dr. Chandler's medical notes contain no discussion of a prior MRI.

[2] As of the date of Employee's first appointment with Dr. Chandler, Employee was no longer working for Employer. During the expedited hearing, Employee testified that, following a confrontation with the owner, he was told by a Human Resources representative that he was still within the ninety-day probation period and was "not a good fit." As a result, he was provided what he called "termination papers."

[3] The surveillance video itself was excluded from evidence by the trial judge at the expedited hearing.

3

low back condition. Counsel attached the written surveillance report and the video from the investigator, but went on to inform Dr. Chandler that, given Employee's purchase of mulch and his act of loading the mulch into his car on May 21, 2024, he "[p]resumably . . . was also able to lay the mulch and spread it at his home."[4] Counsel then stated, "[a]ll of these tasks seem to contradict [Employee's] symptoms and limitations he self-reports to you." After offering Dr. Chandler this summary of the surveillance report and Employer's legal position, counsel asked Dr. Chandler the following question: "[D]o you believe [Employee's] lumbar degenerative disc disease and need for treatment are more than 50% related to his reported February 14, 2024 work injury?" Dr. Chandler marked "NO." Although there was space on the questionnaire for further comments, Dr. Chandler offered none. He then checked "NO" in response to the question, "[D]o you believe [Employee] is at [m]aximum [m]edical [i]mprovement for any injury he may have suffered to his lumbar spine on February 14, 2024's lumbar degenerative disc disease and need for treatment are <u>more than 50%</u> related to his reported February 14, 2024?" (Emphasis in original.) Again, he offered no further explanation for his response.

Several months later, in response to a questionnaire from Employee's counsel dated February 14, 2025, Dr. Chandler agreed that the work-related accident "aggravated [Employee's] preexisting conditions." He then wrote, "[a]ggravated meaning caused symptoms from an already present underlying condition." In response to a question regarding the need for additional medical treatment, Dr. Chandler wrote that "[i]f [Employee] is capable of moving bags of mulch, I would opine that he is at [maximum medical improvement]." The record indicates he had not seen Employee during the interim between his responses to Employer's questionnaire, at which time he indicated Employee was *not* at maximum medical improvement ("MMI"), and the date he responded to Employee's questionnaire, when he concluded Employee *was* at MMI.

After Employer denied further benefits, Employee obtained additional physical therapy through the Veterans' Administration. As of the date of the expedited hearing, however, he testified he continued to experience ongoing symptoms in his lower back and leg, which he described as "[b]etter days, worse days."

Employee was also examined by Dr. James Fish on July 11, 2025, as an independent evaluation. Employee testified that he provided Dr. Fish the disc containing the 2019 MRI films, discussed his preexisting low back condition with Dr. Fish, and discussed the surveillance photographs. In his report, Dr. Fish described Employee's complaints of low back, left hip, and left leg pain as "moderate to severe." He noted Employee's prior history of back pain but stated that Employee had sought no treatment for that condition for several years before the 2024 work accident. Following his review of the pertinent records and his

---

[4] During the expedited hearing, Employee acknowledged he opened the bags of mulch and helped spread it in his garden but testified that his children and a neighbor helped with this task. He also testified, "I didn't get down on the ground" while performing this task.

physical examination of Employee, Dr. Fish diagnosed a lumbar disc herniation with radiculopathy.  He also offered the following opinion addressing medical causation:

> Based on the mechanism of injury and [Employee's] symptoms that he described, I would say that his work-related injury from February of 2024 is the primary cause of [Employee's] current lumbar issues (meaning greater than 50%) . . . .  It is possible to sustain a disc herniation on top of degenerative dis[c]s in the lumbar spine from a significant jolt or injury.  Based on the medical records, there was an acute change in his symptoms after the injury.

Employee testified that he trusted Dr. Fish's evaluation and would like to continue treating with him.  In the alternative, he proposed selecting a new orthopedic physician from a panel if the court determined that was appropriate.

Following the expedited hearing, the court entered an order in which it determined that the medical causation opinions offered by Dr. Fish rebutted the presumption of correctness accorded Dr. Chandler's opinions.  Specifically, the Court determined that Employee "suffered an intensification or worsening of his preexisting degenerative condition that contributed more than 50% in causing his disability and need for medical treatment."  However, the court declined to designate Dr. Fish as Employee's authorized treating physician and instead instructed Employer to authorize a return appointment with Dr. Chandler.[5]  Employer has appealed.

**Standard of Review**

The standard we apply in reviewing a trial court's decision presumes that the court's factual findings are correct unless the preponderance of the evidence is otherwise.  *See* Tenn. Code Ann. § 50-6-239(c)(7) (2025).  When the trial judge has had the opportunity to observe a witness's demeanor and to hear in-court testimony, we give considerable deference to credibility determinations made by the trial court.  *Madden v. Holland Grp. of Tenn., Inc.*, 277 S.W.3d 896, 898 (Tenn. 2009).  However, "when it comes to deposition testimony, an appellate panel is in the same position as the trial court to make credibility determinations."  *Edwards v. Peoplease, LLC*, No. W2024-01034-SC-R3-WC, 2025 Tenn. LEXIS 514, at *18 (Tenn. Dec. 22, 2025).  Thus, when medical proof is presented by deposition, "the reviewing court may draw its own conclusions about the weight and credibility of the expert testimony."  *Id.*  Moreover, the interpretation and application of statutes and regulations are questions of law that are reviewed *de novo* with no presumption of correctness afforded the trial court's conclusions.  *See Mansell v. Bridgestone Firestone*

---

[5] The court also declined to order payment of additional temporary disability benefits because that issue had not been marked as a disputed issue on the dispute certification notice.  *See* Tenn. Code Ann. § 50-6-239(b)(1).  That issue is not within the scope of this appeal.

*N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013).  We are also mindful of our obligation to construe the workers' compensation statutes "fairly, impartially, and in accordance with basic principles of statutory construction" and in a way that does not favor either the employee or the employer.  Tenn. Code Ann. § 50-6-116 (2025).

**Analysis**

In its appellate brief, Employer identified three issues, which we have restated as follows: (1) whether the trial court erred in its assessment of the expert medical opinions; (2) whether the trial court erred in concluding Employee is likely to prevail at trial in proving a compensable aggravation of his preexisting lumbar condition; and (3) whether the trial court erred in excluding its surveillance video.

*Weighing Expert Medical Opinions*

Initially, we note that Employer has incorrectly framed the first issue.  In its brief, Employer questions whether the trial court "abused its discretion in weighing the expert medical opinions."  However, on appeal, a trial court's evaluation of expert medical proof is not subject to an abuse-of-discretion standard of review.  Instead, we are to afford the trial court's findings a presumption of correctness "unless the preponderance of the evidence is otherwise."  Tenn. Code Ann. § 50-6-239(c)(7).  Moreover, as noted above, when expert medical proof is in the form of documentary evidence, "an appellate panel is in the same position as the trial court to make credibility determinations."  *Edwards*, 2025 Tenn. LEXIS 514, at *18.  Thus, we are required to consider the expert medical proof presented to date and determine where the preponderance of the evidence lies.

Here, the trial court accredited the opinions of Dr. Fish over those of Dr. Chandler. We conclude the preponderance of the evidence supports that determination.  The various opinions expressed by Dr. Chandler were confusing, inconsistent, and equivocal at best. For example, in his responses to Employer's July 18, 2024 questionnaire, he marked "no" in response to a question asking whether Employee had reached MMI for "any injury he may have suffered to his lumbar spine on February 14, 2024's lumbar degenerative disc disease and need for treatment are more than 50% related to his reported February 14, 2024."  First, it is unclear what the question was asking.  Regardless, Dr. Chandler marked "no" without further explanation.  A reasonable inference to be taken from the phrasing of the question and his response is that he believed Employee suffered a work-related injury or aggravation to his lumbar spine on February 14, 2024, and had not yet reached MMI, suggesting further treatment was reasonable and necessary.  Second, this interpretation is further supported by Dr. Chandler's responses to Employee's October 9, 2024 questionnaire, where Dr. Chandler agreed that Employee had "aggravated [his] pre-existing conditions."  Dr. Chandler further explained his response by adding, "[a]ggravated meaning caused symptoms from an already present underlying condition."

6

To further compound his confusing responses, Dr. Chandler was asked on Employee's questionnaire whether Employee needed further treatment "for the aggravation he suffered to his pre-existing conditions," and he marked "no" but wrote, "If [Employee] is capable of moving bags of mulch, I would opine that he is at MMI." Thus, although there is no evidence Dr. Chandler examined Employee between the dates he responded to each questionnaire, he changed his opinion as to whether Employee had reached MMI without adequate explanation.

Conversely, Dr Fish's opinions were unequivocal. In his July 11, 2025 report, Dr. Fish described the work accident and the symptoms Employee reported in his left leg, left hip, and low back. He reviewed medical reports from other providers and the diagnostic scans. He then opined that "his work-related injury from February of 2024 is the primary cause of [Employee's] current lumbar issues (meaning greater than 50%)." He then stated that Employee "is an excellent candidate for lumbar epidural steroid injections and further supervised physical therapy." In short, our review of the evidence presented to date supports the trial court's determination on this issue.

*Likelihood of Prevailing*

Next, Employer asserts that, due to the trial court's incorrect interpretation and weighing of the expert medical proof, it also erred in concluding Employee was likely to prevail at trial in proving entitlement to additional medical benefits. In its brief, and again during oral argument, Employer asserted Employee had failed to meet his burden of showing a likelihood of proving at trial that the work accident caused a compensable aggravation of his preexisting condition. We disagree.

First, we note that an employee with a preexisting condition is entitled to medical benefits even if the work accident caused only a temporary aggravation of that preexisting condition. *See, e.g.*, *Edwards*, 2025 Tenn. LEXIS 514, at *25 ("[T]he natural and ordinary meaning of 'aggravation' does not require a *permanent* change or a *permanent* worsening of a condition.") (emphasis in original); *Miller v. Lowe's Home Centers, Inc.*, No. 2015-05-0158, 2015 TN Wrk. Comp. App. Bd. LEXIS 40, at *18 (Tenn. Workers' Comp. App. Bd. Oct. 21, 2015) ("[A]n aggravation or exacerbation need not be permanent for an injured worker to qualify for medical treatment reasonably necessitated by the aggravation.").

Second, in its brief on appeal, Employer asserts that, prior to the work accident, Employee was "unable" to do his job without limitation. The apparent basis for this argument was that Employee had previously qualified for certain disability benefits related to his low back condition. Employer then argued, "It would be naïve to assume that Employee was receiving such benefits without having any 'limitations.'" We conclude, however, that naïveté has nothing to do with the analysis. Instead, we look to the evidence presented during the hearing. Here, Employer presented no evidence to support a finding that Employee was working under any specific physical restrictions or that he was

7

incapable of performing any essential function of his job prior to the work accident. Moreover, Employer presented no evidence that Employee had sought medical treatment for his low back for at least several years prior to the accident. Finally, Employee testified without contradiction that the symptoms he suffered in his low back after the work accident were more severe than any he had experienced previously.

In sum, we conclude there is sufficient evidence in the record to support the trial court's finding that Employee is likely to prove at trial he suffered a compensable injury to his left leg and/or a compensable aggravation to his low back. The extent to which such injuries may have caused any permanent disability has yet to be determined, but such a finding is not a necessary element of Employee's claim for additional medical benefits at this interlocutory stage of the case.

*Exclusion of Surveillance Video*

During the expedited hearing, the parties discussed with the court the surveillance video and the investigator's report describing Employee's activities on May 21, 2024. The events on the date in question were addressed during Employee's cross examination, and he admitted to having engaged in most of the events described. However, when Employer sought to admit the surveillance video into evidence, Employee objected on the basis that the video had not been properly authenticated and had not been provided in advance of the hearing in accordance with court rules.[6] In response, Employer asserted that Employee himself could authenticate the video through his testimony. Employer further argued that the surveillance had been identified on its witness and exhibit lists as "rebuttal impeachment." The trial court sustained Employee's objection, and the surveillance video was excluded from evidence. In its expedited hearing order, the court explained that part of the basis for excluding the video was that it could be neither rebuttal nor impeachment evidence in circumstances where Employee admitted to the events depicted in the video.

Rule 901 of the Tennessee Rules of Evidence states that "authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." Tenn. R. Evid. 901(a). Moreover, "reasonable assurance, rather than absolute assurance, is the prerequisite for admission." *State v. Kilpatrick*, 52 S.W.3d 81, 87 (Tenn. Crim. App. 2000). Thus, in the circumstances of a given case, whether such

---

[6] Tenn. Comp. R. and Regs. 0800-02-21-.15(1)(a) states, "The party opposing the hearing request must file *documents*, including any affidavits or T.R.C.P. Rule 72 declarations, demonstrating the moving party is not entitled to the relief requested no later than ten (10) business days before the date of the expedited hearing." (Emphasis added.) Subparagraph (b) then states that "[e]vidence . . . not disclosed in accordance with this rule, except for witnesses or evidence intended for impeachment or rebuttal purposes, will not be considered unless good cause is shown for why the evidence . . . was not timely disclosed." Given our holdings in this matter, we need not address whether a surveillance video falls within the mandate of subparagraph (a).

testimony, including the testimony of the subject of the surveillance, is sufficient to satisfy the requirements of Rule 901 is within the discretion of the trial court. *Allen v. MJ Resurrection, Inc.*, No. 2024-80-6984, 2025 TN Wrk. Comp. App. Bd. LEXIS 17, at *8 (Tenn. Workers' Comp. App. Bd. May 7, 2025) ("A trial court's evidentiary rulings are reviewed for an abuse of discretion.").

The Tennessee Supreme Court's Special Workers' Compensation Appeals Panel addressed a similar issue in *Johnson v. Transportation Unlimited*, No. 01S01-9804-CH-00079, 1999 Tenn. LEXIS 428 (Tenn. Workers' Comp. Panel Sept. 20, 1999). In *Johnson*, the employer had obtained a surveillance video that showed the employee washing an antique car and later showing it at a car show. *Id.* at *16. The employer called as a witness the investigator who had operated the camera, but he admitted during his testimony that he had not viewed the video before identifying it. *Id.* at *17. Despite the employee's objection that the video was not properly authenticated, the trial court admitted the video into evidence. In addressing the issue on appeal, the Appeals Panel explained:

> Even if the admission of the tape was error, which we do not hold, it was harmless in view of our conclusions concerning the other issues. Moreover, both the [employee] and his wife admitted that he washed and showed his antique car in an effort to sell it to raise money for living expenses . . . .

*Id.* Here, we reach a similar conclusion. The surveillance video purportedly shows physical activities Employee admitted he did. Even if the trial court erred in excluding the video, we conclude any such error was harmless in view of our other holdings as noted above.

## Conclusion

For the foregoing reasons, we affirm the trial court's order and remand the case. Costs on appeal are taxed to Employer.